IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| NYDIA MACHUCA-ADAMES; LUIS GARCIA-LLANOS<br>Plaintiffs<br>vs<br>PRESBYTERIAN COMMUNITY HOSPITAL, INC. or, alternatively, JOHN DOE CORPORATION, d/b/a ASHFORD PRESBYTERIAN COMMUNITY HOSPITAL; DR. OWEN CONNELLY-MONTESINO and his wife JANE DOE, personally and in representation of their conjugal partnership; DR. SHEILA M. ASHBY-VILA and her husband JOHN ROE, personally and in representation of their conjugal partnership; JOHN DOES 1,2,3; CORPORATIONS A,B,C; UNKNOWN INSURANCE COMPANIES A THROUGH D<br>Defendants | CIVIL 12-1979CCC |

**ORDER ON SECOND FED. R. CIV. P. 50 MOTION**

The major issue raised by both defendants in their oral Fed. R. Civ. P. 50(c) motions relates to the departure of the standard of care identified as number 4 by Dr. Bruce Halbridge, plaintiffs' expert, at page 6 of his June 23, 2015 Amended Report. During his direct examination on June 1, 2016, Dr. Halbridge gave the following narrative regarding this alleged departure from the standard of care:

> MR. EFRON: What is the next departure that you observed on the defendants' part in this case?
>
> THE COURT: This would be number four.
>
> MR. EFRON: Yes, Your Honor, number four.
>
> DR. HALBRIDGE: It reads as follows: "The failure of Dr. Ashby and the labor and delivery nurses to recognize that the

administration of Pitocin augmentation of labor was contraindicated at 16:45 on 6-28-10."

MR. EFRON: And 16:45 is?

DR. HALBRIDGE: 4:45 in the afternoon.

THE COURT: Wait a moment. Continue.

MR. EFRON: Go ahead.

DR. HALBRIDGE: "The standard of care recognizes that normal uterine contraction frequency is five or less contractions in ten minutes, averaged over a 30-minute window. During the period from 3:45 to 4:45, there were a total of 30 uterine contractions, that is, one contraction every two minutes."

MR. EFRON: What does that mean?

DR. HALBRIDGE: That means that before Pitocin was started, this patient was already having contractions every two minutes. That's as good as it gets and you don't want them any closer than that because it will cause trouble.

MR. EFRON: And your next sentence states?

DR. HALBRIDGE: "The administration of Pitocin augmentation of labor directly resulted in the development of tachysystole as documented in the contraction chart on pages 10 to 13."

THE COURT: All right. Wait a moment, please. Continue.

MR. EFRON: These pages 10 to 13 in the contraction chart, is that the fetal heart monitor readings in the medical record?

DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), page 42, line 22 through page 44, line 5.

Both parties acknowledge that, according to Machuca-Adames' hospital record, the administration of Pitocin began at 4:45 PM and was stopped at 9:07 PM. Dr. Halbridge acknowledged during his direct examination, page 50 of the June 1, 2016 transcript, that Pitocin was stopped at 21:07 hours or 9:07 PM and that he "misspoke" when he gave that hour as 20:07 or 8:07 PM. Plaintiff's fetal-maternal monitoring tracings are reflected in the chart at

pages 3 and 4 of Dr. Halbridge's amended report dated June 23, 2015 which correspond to Joint Exhibit II(C).

The standard of care departure identified as number 4 has to do strictly with the failure of defendants to recognize that administration of Pitocin at 4:45 PM was contraindicated. This departure refers to a particular event - the first administration of Pitocin at 4:45 PM. However, Dr. Halbridge used in his testimony before the jury the incorrect maternal contractions' tracing that belonged to a mistaken patient's data in support of the allegation that Pitocin was contraindicated at 4:45 PM. He also made that same mistake at page 6 of his Amended Report when discussing deviation number 4. For some unexplained reason, Dr. Halbridge used as supporting data on both occasions the "contraction chart at pages 10-13" which reflected a total of 30 uterine contractions in the period of 15:45-16:45 which had been discarded as data belonging to Machuca-Adames in the Orders of March 2, 2015 and May 8, 2015.

This triggered a major issue raised in the second Rule 50 motion by both defendants given the improper use by plaintiff's expert and her attorney of contractions for the 1-hour period from 3:45 to 4:45 PM (15:45-16:45) pertaining to another patient. They claimed that the use of data pertaining to another person brought flawed data and a flawed expert's opinion to the jury's consideration. Movants stretch the use of flawed data and the corresponding testimony beyond the deviation of standard of care number 4 to the entire spectrum of deviations of standard raised by plaintiffs. However, the flawed data incorrectly used by plaintiffs at trial is confined to deviation number 4. The table of correct fetal-maternal monitor tracings for plaintiff Machuca-Adames starting at 16:30-16:40 up to 21:30-21:40, which is in evidence, appears at

pages 3-4 of Dr. Halbridge's June 23, 2015 Amended Report and was also covered in his testimony. This table covers the entire tracings period starting at 16:30-16:40 (4:30-4:40 PM) until 21:30-21:40 (9:30-9:40 PM). It pertains to that entire timespan and is relevant to other deviations, particularly number 3: the failure of Dr. Ashby and the Labor and Delivery nurses to recognize the presence of recurrent episodes of tachysystole and then take action to eliminate the tachysystole pattern of uterine contractions by stopping Pitocin administration.

Although the Court finds no justification for having brought before the jury a contraction chart and a 1-hour timeframe belonging to the wrong patient as part of Dr. Halbridge's explanation of why Pitocin was contraindicated at 4:45 PM when first administered, after considering the evidence pertaining to the other alleged deviations, it determines that the adequate remedy lies in striking the fourth deviation of the standard of care alleged and the expert testimony supporting it. By the same token, defendants should have alerted the Court before Dr. Halbridge testified that at page 6 of his Amended Report he referred to an erroneous contraction chart belonging to someone other than the plaintiff. Instead, they postponed the matter until Dr. Halbridge's cross-examination in an attempt to impeach him.

Given these circumstances, the jury will be informed exactly which portions of Dr. Halbridge's testimony in direct are being stricken from the record and instructed that they are not to consider such testimony in any manner. Since the transcript of Dr. Halbridge's testimony on cross-examination by attorney Benito Rodríguez-Massó reflects that he insisted in using data previously discarded by the May 8, 2015 Order as belonging to plaintiff, specifically the tracing for the 1-hour period from 3:45 PM to 4:45 PM, with a

count of 30 uterine contractions, the jury will be clearly instructed that such testimony on cross has been stricken and cannot be considered by them in any way and will be told the reasons why attorney Efron and Dr. Halbridge were precluded from making any reference to such data at trial.

The Fed. R. Civ. P. 50 Motion filed by defendants is GRANTED as to the departure from the standard of care number 4, defined by plaintiffs' expert as "the failure of Dr. Ashby and the Labor and Delivery nurses to recognize that the administration of Pitocin augmentation of labor was contraindicated at 16:45 (4:45 PM) on June 28, 2010" and included as one of the medical malpractice claims raised in the complaint.

We will now address the second departure from the standard of care raised by Dr. Halbridge in his Amended Report and during his trial testimony (see Dr. Halbridge's direct examination, Transcript June 1, 2016, pp. 29-30, d.e. 100). This second departure was defined as "[t]he failure of Dr. Ashby and the Labor and Delivery Nurses to examine the patient at least every two hours while in labor and after 4 cm. of cervical dilatation is reached." At trial, Dr. Halbridge modified the expert opinion he had rendered in his Amended Report and stated for the first time that plaintiff Machuca-Adames was a high risk patient and that she had to be checked every hour to see if she was making progress in labor. The jury was subsequently instructed that the Court had stricken his testimony in that regard because the examination-for-dilatation span that he had mentioned in his Amended Report was at least every two hours, not every hour. They were further instructed that they could only consider that part of his testimony that was consonant with his Amended Report, that is, that the patient had to be examined every **two** hours to see if she was making progress in labor.

Dr. Halbridge's own testimony during cross-examination reflects that plaintiff was examined at least every two hours to check the progress of her labor. The following excerpts of his June 1, 2016 morning testimony are relevant to this conclusion:

Referring to the Nurses' Notes (Joint Exhibit II(B)), he testified:

> DR. HALBRIDGE: 4:20, 16:20, Dr. Ashby evaluates patient, cervical dilatation, 3 centimeters, orders patient admission. 16:40, 4:40, Dr. Ashby evaluates patient, dilatation 3 centimeters; clear liquid; fetal signs, 176 per minute. Ordered Pitocin 16:45, 4:45, lactated ringer's, R/L started 500 milliliters with Pitocin 20 units at 5mm per hour. Patient oriented, presents no adverse reaction at the moment.
>
> MR, RODRIGUEZ: Thank you. So from that note we know that she's being attended to from 4:00 up to 4:45; that she has a 3-centimeter dilatation by Dr. Ashby's notes, right?
>
> DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), p. 100, line 19 through p. 101, line 5.

> DR. HALBRIDGE: 5:00 PM, 170 beats per minute, cervix is 4 centimeters dilated, 80 percent effaced. Station of the head is at minus one station, and AROM means artificial rupture of membranes performed.
>
> MR. RODRIGUEZ: And this one?
>
> DR. HALBRIDGE: 6:00 PM, heart rate is 156 per minute, baby's heart rate. Cervix is five centimeters dilated, 80 percent effaced. And they don't list the station of the fetal head.
>
> MR. RODRIGUEZ: This was - - and I'm sorry, page 6 on Joint Exhibit Roman Numeral II(B).

June 1, 2016 trial transcript (d.e. 100), p. 101, line 17 through p. 102, line 1.

Referring to the Labor Progress Chart:

> DR. HALBRIDGE: Yes, it's the labor progress chart entitled Examinations During Labor.
>
> MR. RODRIGUEZ: And they are performed by who?
>
> DR. HALBRIDGE: It doesn't say.

THE COURT: Could you point to the title of that document at page 6, where you said examinations - -

DR. HALBRIDGE: Examinations During Labor.

. . . .

MR. RODRIGUEZ: Would you please read this line?

DR. HALBRIDGE: 170 - - 5:00 PM; fetal heart rate, 170 beats per minute. Pelvic exam, 4 centimeters, 80 percent effaced, minus one station of the head. AROM, artificial rupture of the membranes.

MR. RODRIGUEZ: The next line please.

DR. HALBRIDGE: 6:00 PM, 156 beats per minute, 5 centimeters dilated, 80 percent effaced, and the station is not - - the station of the fetal head is not listed.

MR. RODRIGUEZ: And those are notes made by whom, if I can help you here?

DR. HALBRIDGE: It says attending.

MR. RODRIGUEZ: Attending physician, but you cannot make out the signature?

DR. HALBRIDGE: That's true.

MR. RODRIGUEZ: So at 6:00 PM, an attending physician was already doing some work with this patient regarding her cervix dilatation?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: And it has started, according to that document, since 5?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: And she arrived at 4?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: So, at 4 she had three centimeters at arrival.

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: Four centimeters at 5:00 PM?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: That's one hour after that, according to this document?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: And at 6:00, 5 centimeters?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: All on one-hour period of time?

DR. HALBRIDGE: From 5 to 6, yes.

MR. RODRIGUEZ: From 3 to 5.

DR. HALBRIDGE: Well, from 4 to 5 to 6.

MR. RODRIGUEZ: Sorry, from 4 when she arrived, to 5, to 6?

DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), p. 103, lines 10 to 17, lines 24-25; p. 104, lines 1-25; p. 105, lines 1-8.

MR. RODRIGUEZ: Doctor, she arrived at 4?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: And she had a 3-centimeter dilatation?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: At 5 in the afternoon, 5:00 PM, she had a 4-centimeter dilatation?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: And at 6:00 PM she had a 5-centimeter dilatation?

DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), p. 106, lines 1-10.

Referring to page 6 of Joint Exhibit II(A):

MR. RODRIGUEZ: Doctor, further down in that same page, kindly read this patient nursing note right here.

DR. HALBRIDGE: 6-28-10, 19:58

MR. RODRIGUEZ: That would be?

DR. HALBRIDGE: That would be at almost 8:00, 7:58. Ashby assisted with pelvic exam, states cervix 6 centimeters dilatation.

MR. RODRIGUEZ: Does that tell you anything about this patient being attended to?

DR. HALBRIDGE: Yes, it says that the patient was examined at that time.

MR. RODRIGUEZ: By Dr. Ashby?

DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), p. 110, lines 14-24.

THE COURT: We are still at page 6?

MR. RODRIGUEZ: Yes, same page. This activity date, Doctor?

DR. HALBRIDGE: It says 6-28-10. Time 20:57. Ashby evaluates patient who is at 6 centimeters dilatation.

THE COURT: That would be 8:57?

DR. HALBRIDGE: Yes, Your Honor?

June 1, 2016 trial transcript (d.e. 100), p. 111, lines 17-24.

MR. RODRIGUEZ: So from close to 8, which would be 7:58, right, which was the note before that, to this moment in time, same dilatation?

DR. HALBRIDGE: That's right.

MR. RODRIGUEZ? And that was at 8:57?

DR. HALBRIDGE: Yes.

MR. RODRIGUEZ: So she was, at 8:57, was also being taken care of?

DR. HALBRIDGE: Yes, she was examined at 8:57 by Dr. Ashby.

June 1, 2016 trial transcript (d.e. 100), p. 112, lines 1-8.

DR. HALBRIDGE: They examined the patient, but they didn't use the information to recognize that there was an arrest of descent, an arrest of dilatation, and even more importantly, that the patient was having uterine contractions too frequently, at less than two-minute intervals for these long four hours, five hours.

THE COURT: Bt that's not really what you were asked. You were asked if she was in fact examined every two hours after the 4-centimeter dilatation.

DR. HALBRIDGE: Yes.

June 1, 2016 trial transcript (d.e. 100), p. 121, lines 1-10.

The decision to make a C-section was taken at 9:06 PM by Dr. Ashby. (TR, p. 119, lines 7-12). The baby was delivered at 10:11 PM.

Given the testimonial evidence outlined above, the second Fed. R. Civ. P. 50 motion is GRANTED as to the departure from the standard of care number 2, defined by plaintiffs' expert as "[t]he failure of Dr. Ashby and the Labor and Delivery Nurses to examine the patient at least every two hours while in labor and after 4 cm. of cervical dilatation is reached" and raised as one of the medical malpractice claims in the complaint.

The Fed. R. Civ. P. 50 Motion is DENIED as to the remaining claims set forth in the medical malpractice complaint which refer to departures from standard of care numbers 1, 3, 5, 6, 7, 8 and 9.

SO ORDERED.

At San Juan, Puerto Rico, on June 29, 2016.

S/CARMEN CONSUELO CEREZO
United States District Judge